Exhibit "1"

PERFORMER ENGAGEMENT AGREEMENT

This Agreement dated November 22, 2016, sets forth the basic terms covering the engagement of Hi Happy Films, Inc. ("Lender") to loan out the time and services of Tara Reid ("Performer") to Shamrocky, LLC ("Producer") (all parties, collectively, may be referred to as the "Parties") as a performer in the motion picture presently known under the working title "SILVER SHAMROCK" (the "Picture").

1. CONDITIONS PRECEDENT. Producer's obligations under this Agreement are conditioned upon receipt by Producer of the following documents.
    1.1. A original copy of this Agreement and Exhibits A and B attached hereto (in form and substance acceptable to Producer) that has been signed by Lender and Performer before principal photography;
    1.2. Lender's providing Producer with all documents which may be reasonably required by any governmental agency or otherwise for Lender to render Performer's services hereunder, together with Performer's submission to Producer of original documents establishing Performer's eligibility (Producer acknowledge this condition has been satisfied); and
    1.3. Producer's receipt of all forms and documents necessary to enable Producer to effect payment to Lender, including tax and corporation identification forms. (Producer acknowledges this condition has been satisfied.)

2. ROLE: "April"

3. SERVICES. Producer agrees to borrow from Lender on a pay or play basis and Lender agrees to lend to Producer upon the terms and conditions herein specified, the services of Performer to perform the Role set forth in paragraph 2, above, in the Picture. The services of Performer shall be on a first priority basis for on-location principal photography for 24 non-consecutive Production Days to be determined from January 20, 2017 through March 30, 2017, to perform such services for Producer. Producer will use reasonable best efforts for Performer not to shoot from February 15 through February 21, but this is not a guarantee and Performer must make herself available during this time. In addition, Performer shall make herself reasonably available for a reasonable number of press and guests of the Producer as well as participate in the taping of interviews (including live web events), TV Bumpers, and behind-the-scenes recordings, including the production of an electronic press kit and "making of"-type recordings during production, otherwise subject to Performer's availability, Performer shall have the right to disapprove any publicity provided Performer performs timely and reasonable substitutions to be used for the promotion, marketing and publicity of the Picture . Such publicity services of Performer shall also include making herself available for a photo gallery shoot during production. In addition, Performer shall make herself reasonably available for publicity of the Picture in the three (3) weeks prior to the release date of the Picture currently scheduled for July of 2017. Performer shall also positively promote the Picture and its release using Performer's social media accounts during the release of the Picture.

Following completion of principal photography, Lender shall provide Performer for one (1) day of looping. Any looping beyond one (1) day shall be at Performer's pro-rata daily rate. Performer's services are conditioned upon Producer becoming a SAG signatory prior to Performer's services. Producer will pay pension & health benefits as per SAG rules in the normal course. Producer will provide a stunt double for physical stunts that Performer is not comfortable doing herself.

4. COMPENSATION. Except as otherwise set forth herein, as compensation in full for Performer's services and the rights granted to Producer pursuant to this Agreement, provided, Lender/Performer is not terminated for material, uncured default and has performed all material services reasonably required hereunder, Producer shall pay to Lender one hundred twenty five thousand dollars ($125,000.00) under SAG schedule F. The sum of one hundred twenty five thousand dollars ($125,000.00) shall be paid to Performer through Performers Representation's Escrow Account, set up by Performer's Representation, twenty four (24) hours before Performer's start of Picture. Performer's engagement is "pay or play" and while Producer shall not be obligated to utilize Performer's services in or in connection with the Picture hereunder, Producer's sole obligation, subject to the terms and conditions of this Agreement, being to pay Performer one hundred twenty five thousand dollars ($125,000.00.)

5. DRESSING ROOM. Producer shall provide Performer with a dressing room trailer, no less than half a double banger, for Performer's exclusive use. Performer shall enjoy most favored nation status *vis a vis* other cast members with respect to the size and quality of such trailer.

6. TRANSPORTATION AND EXPENSES. Producer shall furnish Performer with one airline ticket, First Class or Business Class if used and if available, for travel between Los Angeles and the proximate airport to any location outside of Los Angeles County for principal photography (the "Location") for the Picture and also provide one additional airline ticket, no less than business class nature if used and if available for travel between the Location and Los Angeles, California. Producer shall pay a per diem to Performer the greater of, as outlined in the SAG CBA or Most Favored Nations per diem paid to Ian Ziering while Performer is on Location for the production of the Picture. Producer shall provide Performer with a vehicle and driver to transport Performer to and from airports (exclusive) and Performer's Location hotel accommodations and between Performer's Location hotel accommodations and the Location site(s) (shared or exclusive with Above-the-Line only) whenever Performer's services are requested. Producer shall provide hotel accommodations of a four star nature if used and if available while Performer is on Location for the production of the Picture. For clarity there will be no transportation, hotel or per diem for Performer during principal photography in Los Angeles County to the extent allowed under SAG rules.

7. PRODUCTION CONDITIONS. Notwithstanding anything in the foregoing it is specifically agreed that with any water shoots, the water will be heated to no less than

ninety degrees (90°). This will include all tank shoots. Obviously, for natural water body scenes artist reserves the right to use a stunt double as permitted by SAG.

8. CONTINGENCIES. Performer's services, and any obligations of Producer, may be suspended during all periods (a) with written notice, that Performer does not render material services hereunder because of illness, incapacity, or material default; (b) with notice, that production of the Picture is materially prevented or interrupted because of force majeure events (i.e. any labor dispute, fire, war, governmental action, or any other unexpected or disruptive event sufficient to excuse performance of this Agreement as a matter of law), or the death, illness or incapacity of a principal member of the cast. All dates herein set forth or provided for shall be postponed for a period equivalent to the period of such event. If any matter referred to in (a), other than default, shall exist for 10 business days or more, Producer may terminate Performer's engagement hereunder. If any matter referred to in (b) shall exist for 8 weeks or more, either party may terminate this agreement. In the event of any refusal to perform or other default on the part of Performer, Producer may terminate Performer's engagement hereunder if Performer fails to cure such default (including payment/credit of such production costs incurred which can be reasonably linked to such default) within 48 hours of reasonable notice to Performer of such default. Notwithstanding anything herein contained, if any suspension under (b) shall continue for 2 weeks or more, Performer may render services for others during the continuance of such suspension, subject to immediate recall on 72 hours notice on the termination of such suspension. There shall be no selective suspension/termination/reinstatement for any force majeure event. Provided Lender and Performer are terminated for force majeure event or disability, the credit (provided Performer appears in the Picture), insurance and indemnity provisions hereof survive such termination.

9. CREDIT. Upon condition that Performer appears in the Picture, Producer shall give Performer on-screen credit as a separate card in the main titles in no less than Second position of any other on-screen performers as follows: "Tara Reid." Performer's credit shall not be less than the same size, type, style or duration of other performers in the Picture. Performer shall receive credit in all paid ads issued by or under Producer's control, subject to customary exclusions and exceptions. All other aspects of Performer's credit (if any) shall be determined in Producer's sole discretion. In all third party licensing and distribution agreements regarding the Picture, Producer shall require that such third party comply with all Producer's credit obligations regarding Performer. In the event that any such third party agreement has been previously executed and does not include such requirement, Producer shall notify such third party in writing of Producer's credit obligations herein regarding Performer. Notwithstanding the foregoing, no casual or inadvertent failure to comply with the provisions of this Paragraph or failure by any third parties to comply with their agreements with Producer shall constitute a material breach of this Agreement by Producer provided Producer shall use reasonable efforts, other than the payment of money, to prospectively cure any such failure upon written notice from Performer.

9.1. Upon condition that Performer appears in the Picture, Producer shall also give Performer on-screen credit in the main titles that is the same size, duration, and placement as Ian Ziering's Co-Executive Producer credit as follows: "Co-Executive Producer Tara Reid." All other aspects of Performer's credit (if any) shall be determined in Producer's sole discretion. Notwithstanding the foregoing, no casual or inadvertent failure to comply with the provisions of this paragraph or failure by any third parties to comply with their agreements with Producer shall constitute a material breach of this Agreement by Producer provided Producer shall use reasonable efforts, other than the payment of money, lo prospectively cure any such failure upon written notice from Performer.

10. GRANT OF RIGHTS. The results and proceeds of Performer's services hereunder shall constitute a "work-made-for-hire" (it being acknowledged that the results and proceeds of Performer's services are specially ordered and commissioned for use as part of an audio-visual work). Lender/Performer hereby irrevocably and absolutely transfers, sets over and grants to Producer all rights of every kind and nature throughout the world and in perpetuity in and to all results and proceeds of Performer's services hereunder. Performer hereby waives all so-called "moral rights." Such grant of rights is limited to inclusion in the Picture and all matters relating to the Picture, including, but not limited to, the promotion, marketing, and commentary relating to the Picture.

11. NAME AND LIKENESS. Subject to paragraph 20, below, Lender/Performer hereby grants to Producer the irrevocable and perpetual right to use and publish and to permit others to use and publish Performer's name, voice, and approved likeness and/or approved biography in solely connection with the production, exhibition, advertising and other exploitation of the Picture and all subsidiary and ancillary rights therein, in any and all media, including, but not limited to, audio recordings (in any configuration) containing any material derived from the Picture, including, without limitation, all or any part of the soundtrack of the Picture, publications, merchandise (in-character only) and commercial tie-ups. If any such soundtrack, publication, or merchandise generates income to Producer, Performer shall be entitled to ten percent (10%) of Producer's gross share if the product license uses Lender's image exclusively and two and one half percent (2.5%) if the product uses Lender's image in addition to other performers who also share in product license royalties actually paid. Producer shall provide Performer with statements and payment annually and only in the event that royalties are due Performer. For avoidance of doubt, if $100,000 is paid to Producer and Lender is the only person for which merchandising is done, then Lender would receive $10,000. Or, if Producer receives $100,000 and Lender appears with one other actor that is receiving 2.5%, and that actor is paid $2500, then Lender shall receive a reduction to $7,500. Or, if Producer receives $100,000 and Lender appears with two other actors that receive 2.5%, and those actors are paid $2500 each, then Lender shall receive a reduction to $5,000. However, in no event, shall Performer's likeness be used for any merchandising in association with alcohol, tobacco, gambling, hygiene, or sexual products without Performer's prior written approval.

12. BREACH OF CONTRACT. Except as set forth in paragraph 6, above, no act or omission of either Party hereunder shall constitute an event of material default or breach of this Agreement unless the injured Party first notifies the other Party in writing setting forth such alleged breach or default and the Party does not cure the same within two (2) weeks of receipt of actual written notice from the injured Party. In the event of any breach by Producer of this Agreement, Lender/Performer shall be limited to Lender's/Performer's remedy at law for damages, if any, and shall not have the right to terminate or rescind this Agreement or any rights granted herein or in any way to enjoin or restrain the production, distribution, advertising, or exploitation of the Picture, or any parts or elements thereof.

13. INTEGRATION: This Agreement is the entire agreement among the Parties with respect to the subject matter hereof, and no alteration, modification, or interpretation hereof shall be binding as to any Party unless in writing, expressly designated as such an alteration, modification, or interpretation hereof and signed by such Party.

14. FURTHER ASSURANCES: Each of the Parties, without further consideration, agrees to execute and deliver such other documents consistent herewith and to take such other action necessary, convenient or desirable consistent herewith, in the reasonable opinion of any other party, to effectuate the provisions and intent of this Agreement.

15. CONSTRUCTION. The language of this Agreement has been approved by the Parties. This language shall be construed as a whole according to its fair meaning, and none of the Parties hereto shall be deemed the draftsman of this Agreement or any part hereof, for purposes of any litigation which may arise hereafter between them. If any provision or portion of this Agreement shall be held for any reason to be unenforceable or illegal, that provision shall be severed from this Agreement and the remainder of this Agreement shall remain valid and enforceable between the Parties hereto just as if the provision held to be illegal or unenforceable had never been included in the Agreement.

16. CHOICE OF LAW AND VENUE. This Agreement has been entered into in the State of California and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California. The venue for any action, suit or proceeding arising from or based upon this Agreement shall be the appropriate State and Federal Courts located in the County of Los Angeles in the State of California. In connection with the foregoing, the Parties agree to submit to and be bound by the jurisdiction of the appropriate State and Federal Courts located in the County of Los Angeles of the State of California.

17. BINDING AGREEMENT: This Agreement shall be binding upon all of the employees, agents, officers, directors, shareholders, attorneys, accountants, and any other person acting on behalf of or for the benefit of the Parties.

18. ASSIGNMENT: Producer may transfer or assign this Agreement or all or any part of Producer's rights hereunder to any person, firm or entity, and this Agreement shall operate to Producer's benefit and to the benefit of Producer's successors or assigns. Lender/Performer may not assign this Agreement in whole or in part to any third party. Notwithstanding any such assignment, Producer shall remain bound by all duties contained herein unless such assignment is to a financially responsible third party which assumes Producer's obligations in writing.

19. COUNTERPARTS: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

20. SECTION HEADINGS: The captions and headings of the various sections of this Agreement are for convenience only and are not to be construed as confining or limiting in any way the scope or intent of the provisions hereof.

21. EMPLOYMENT ELIGIBILITY: Producer's obligations herein are expressly conditioned upon Performer's completion and delivery to Producer of the W-9 form.

22. NOTICES: All payments, submittals and notices to Lender/Performer shall be emailed or mailed to:

    PERFORMER
    Tara Reid
    tara.d.reid@gmail.com

    with a copy of all notices to:

    AGENT
    Bobby Moses
    bobby.moses@mavrickartist.com

    ATTORNEY
    Darin Frank
    darin@sowdllp.com

    All notices to Producer shall be emailed to:
    Theresa Bloomfield, Esq.
    malibupictures@earthlink.net

23. PHOTO/LIKENESS APPROVALS: Producer agrees to submit to Performer (in batches of reasonable numbers), through their agent, all still photographs and artistic renderings of Performer which Producer intends to use in merchandising, commercial tie-ins, advertising, exploitation, promotion and/or publicity for the Picture. Performer agrees to respond within three (3) business days (or two (2) business days

if Producer advises Performer in writing that a quick response is needed) following Performer's receipt of such submission and to approve for use not less than 50% of all photographs where Performer appears alone, and 50% of all photographs where Performer appears with other cast members who have approval rights. Performer shall have two (2) "passes" as to non-photographic artistic renderings. Any photographs and renderings approved pursuant to the foregoing shall be deemed approved for all purposes. Further, if Performer fails to respond in a timely fashion with respect to such submission(s), any and all such submissions will be deemed approved for all purposes.

24. EMPLOYMENT OF OTHERS. Except as set forth herein, Lender and Performer agree not to employ any person to serve in any capacity, nor to contract for the purchase or renting of any article or material, nor make any agreement committing Producer to pay any sum of money for any reason whatsoever in connection with the Picture or services to be rendered by Performer or provided by Lender hereunder or otherwise, without the prior written consent of Producer.

25. SAG-AFTRA: During the rendition of Performer's services hereunder, at such time or times and during such period or periods as it may be lawful for Producer to require Performer so to do, Lender/Performer, at Lender/Performer's sole cost and expense, and at Producer's request, shall cause Performer to remain or become a member in good standing of the Screen Actors Guild. Producer warrants and represents that it is or will become a signatory to the Screen Actors Guild Basic Agreement and in good standing prior to the commencement of Performer's services hereunder. Accordingly, Producer will comply with all SAG rules.

26. INSURANCE: Producer shall add Lender and Performer as an additional insured to Producer's E&O and general liability insurance policies.

27. PREMIERES: Producer shall invite and provide exclusive, local (within Los Angeles County) transportation to Performer and one (1) guest to any premiere of the Picture sponsored by Producer.

28. DVD: Producer shall provide Performer with a copy of the DVD of the Picture when such is released to the public.

29. HOLDBACK ON PUBLICITY. Lender and Performer agree that neither will make any press release, public announcement (including, without limitation, facebook, twitter, blogs), statement to media personnel, or respond to press inquiries concerning the Picture or Performer's involvement in the Picture, prior to March 10, 2017, without the express, written permission of Producer.

30. CONSULTING. Producer shall use reasonable efforts to consult with Performer regarding his wardrobe, hair, and make-up. Notwithstanding anything in the foregoing, it is agreed that the make up artist will have both airbrush and traditional make up techniques. However, it is understood and agreed that Producer shall have

final say in all decisions and any such consultation shall not be allowed to cause delay in production of the Picture and such consultation, and any time expended thereon, shall not be within Performer's services defined above or otherwise warrant any compensation.

31. INDEMNIFICATION. Producer shall indemnify and hold Performer harmless from and against all claims, liabilities, damages, costs, and expenses (including outside attorney's fees) arising from Producer's breach of any representation, warranty or agreement herein and arising from the use of any material supplied by Producer to Lender or Performer, or arising out of the development, production, distribution, or exploitation of the Picture or any element thereof, except for claims which arise out of a breach by Lender and/or Performer hereunder and/or intentionally tortious or grossly negligent act(s) or omission(s). Notwithstanding the foregoing, Producer shall have the sole right to engage legal counsel for any such above matter.

32. DUBBING/DOUBLING. Producer will consult with Performer on the use of a double if necessary. Any doubling or dubbing undertaken by Producer shall be per Schedule C, Section 33 of the SAG Agreement, Producer shall have the right to simulate Performer voice, appearance, acts, poses, performance and all instrumental, musical and other sound effects to be performed by Performer in and in connection with the Picture or any part thereof or in any advertising, publicizing or exploitation thereof: (i) when reasonably necessary to expeditiously meet the requirements of foreign exhibition; (ii) when reasonably necessary to expeditiously meet censorship requirements, foreign or domestic; (iii) when, in the reasonable opinion of the Producer, the failure to use a double for the performance of hazardous acts might result in physical injury to Performer; (iv) when Performer is not available with reasonable advanced notice; and (v) when Performer fails or is unable to meet certain requirements of the role, such as, singing or the rendition of instrumental music or other similar services requiring special talent or ability other than that in Producer's opinion possessed by Performer. No nude scenes and no use of a double to perform in the nude or simulated sex without prior written consent.

33. INTENTIONALLY OMITTED

The above terms and conditions of this document have been read, agreed upon, signed and dated, by all parties below.

"PRODUCER"                                    "LENDER/PERFORMER"

By:_____           By: _/s/ Tara Reid_____
Authorized agent for Shamrocky, LLC           Tara Reid, individually and as
                                              President of Hi Happy Films, Inc.

Social Security number: 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

Federal Tax ID number: 95-4397625

EXHIBIT A
INDUCEMENT

Reference is hereby made to that certain Performer Engagement Agreement (the "**Agreement**") dated as of November 22, 2017 and between Shamrocky, LLC ("**Producer**") and Hi Happy Films, Inc. ("**Lender**") for the acting and other services of Tara Reid ("**Performer**") in connection with the Picture referenced in the Agreement. As a material inducement to Producer to enter into the Agreement, the undersigned hereby represents, warrants and agrees as follows:

1. I have heretofore entered into an agreement (the "Employment Agreement") with Lender requiring me to render services exclusively to Lender for at least the full term of the Agreement and authorizing Lender to enter into the Agreement and to furnish my rights and services to Producer upon the terms, covenants and conditions thereof.

2. I am familiar with all of the terms, covenants and conditions of the Agreement and hereby consent to the execution thereof; I shall be bound by and will duly observe, perform and comply with all of the terms, covenants and conditions of the Agreement as if I had executed it directly as an individual, even if the Employment Agreement should hereafter expire or be terminated or suspended, or if Lender should be dissolved or should otherwise cease to exist; I hereby confirm that there have been granted to Lender all of the rights granted by Lender to Producer under the Agreement; and I hereby join in and confirm all grants, representations, warranties and agreements made by Lender under the Agreement.

3. Unless I am deemed substituted for Lender as a direct party to the Agreement pursuant to paragraph 6, below, I will look solely to Lender and not to Producer for compensation for the services and rights I may render and grant to Producer under the Agreement and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

4. I will indemnify and hold Producer and its parents, affiliates, subsidiaries, employees, Performers, officers, successors, assigns and licensees, and each of them, harmless from and against any and all taxes which Producer may have to pay and any and all claims, liabilities, judgments, claims, damages, costs and expenses (including, without limitation, reasonable outside attorneys' and accountants' fees) that Producer may incur by reason of Lender's failure to pay taxes or payments relating to unemployment compensation or insurance, FICA, workers' compensation, disability pensions or any other compensation, tax or other contribution required to be paid in respect of Performer's services hereunder.

5. If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, subject to a reasonable cure period, I shall, at Producer's election, be deemed to be employed directly by Producer for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

6. If Producer serves Lender with any notices, demands or instruments relating to the Agreement or the rendition of my services thereunder, such service upon Lender shall constitute service upon me. In the event of a breach or threatened breach of the Agreement by Lender or me, Producer may join me in any action against Lender without first being required to resort to or exhaust any rights or remedies against Lender.

Executed  11 / 22 , 20 17

_____
[PERFORMER SIGNATURE]

PERFORMER'S AGREEMENT
EXHIBIT B
CERTIFICATE OF OWNERSHIP OF RESULTS AND PROCEEDS (LOANOUT)

The undersigned Tara Reid ("Performer") hereby agrees and certifies that:

Performer is rendering services as an employee of Hi Happy Films, Inc. a California corporation, (Fed. ID #95-4397625 ("Lender") pursuant to a valid employment agreement ("Employment Agreement") with Lender and a Performer Agreement ("Agreement") between Lender and Shamrocky, LLC ("Producer"), dated as of November 16, 2017, pursuant to which Lender has loaned Performer's services to Producer in connection with the theatrical motion picture entitled "SILVER SHAMROCK" ("Picture");

Lender and Performer, for good an valuable consideration, receipt of which is hereby acknowledged, hereby certifies and agrees that all other results and proceeds of Performer's services in connection with the Agreement, and all other materials of every kind whatsoever created by Performer during the period of Performer's exclusive services under the Agreement and/or at any other time if relating to any version of the Picture (or relating to any ancillary, subsidiary, supplemental promotional or derivative work relating to any versions of the Picture) (collectively, "Work"), are a "work made for hire" (as that term is used in the United States Copyright Act) for Producer, prepared within the scope of Performer's employment and/or as a work specially ordered or commissioned for use as a part of a motion picture or other audio-visual work.

Producer is the "author" of the Work for all purposes, including without limitation the copyright laws of the United States, and Producer is the sole and exclusive owner, in perpetuity and throughout the universe, of all right, title and interest in and to the Work, including without limitation all copyrights in and to, the Work (and all renewals and extensions thereof now or hereafter provided by law) and all the rights therein and thereto, including all so-called "moral rights of authors" and "droit moral" rights and any similar rights under the laws of any country of the world, and the right to make such changes therein and uses thereof as Producer may determine by any and all means and/or media now known or hereafter devised.

Performer hereby waives all so-called "moral rights of authors" and "droit moral" rights (and any similar rights under the laws of any country of the world). Performer further irrevocably assigns to Producer (or, if any applicable law prohibits such assignment, Performer grants to Producer an irrevocable royalty-free license of) all of Performer's rights, if any, to authorize, prohibit and/or control the renting, lending, fixation, reproduction and/or other exploitation of the Picture by any media and means now or hereafter known or devised, in perpetuity throughout the universe.

Any remedies Performer may have against Producer in connection with the Work and the Picture shall be limited to the right to recover monetary damages, if any, and Performer waives any right or remedy in equity, including any right to rescind Producer's right, title and interest in and to the Work or to enjoin, restrain or otherwise impair in any manner the development, production, distribution, advertising or other exploitation of the Picture.

Without limiting the foregoing, if any of the Work is not deemed to be a "work made for hire" for Producer, Performer irrevocably and exclusively grants and assigns to Producer all right, title and interest in and to such Work, throughout the universe, in perpetuity, in any and all media, whether now or hereafter known or devised. At Producer's request, Performer shall execute and deliver to Producer such instruments consistent herewith and consistent with the Agreement as Producer may reasonably deem necessary to establish, protect, enforce and/or defend any or all of Producer's rights in the Work and/or under the Agreement, and if Performer fails to do so within ten (10) business days after Producer's written request therefor, Producer shall have the right to execute any and all such documents. Producer shall provide Performer with courtesy copies of any such instruments executed in Performer's name; provided, that Producer's failure to do so shall not be deemed to be a breach of this Certificate or the Agreement or otherwise affect the validity of any such documents.

Performer acknowledges and agrees that Producer shall solely and exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Work, the Picture, and all elements therein for all now known, unknown or hereafter existing uses, digital delivery, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof) and all forms of distribution, exhibition, publication, communication, exploitation, broadcast, transmission, sale, licensing, allied, ancillary and/or subsidiary rights (including character, sequel and remake rights) and in merchandising items of any nature related to any version of the Picture and/or by Producer and/or its parents, affiliates or subsidiaries in

connection with general corporate, archival or institutional uses (e.g., trade shows; corporate meetings and in-house promotions; financial prospectuses and annual reports; archival uses; displays at corporate business locations and properties) or for promotion of their products, in any and all media, whether now or hereafter known or devised

This Certificate of Ownership of Results and Proceeds are subject to the Agreement.

IN WITNESS WHEREOF, Performer has executed this Certificate of Ownership of Results and Proceeds as of this 22 day of 15, 2016.

"PERFORMER"

By: _____

"LENDER"

By: _____

President of Hi Happy Films, Inc.
Federal Tax ID number: 95-4397625

ACCEPTED AND AGREED TO:

_____

"PRODUCER"